# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Case No. 18-cv-61384-BLOOM/Valle

JENETTE HICKS,

      Plaintiff,

v.

COMCAST CABLE COMMUNICATIONS, LLC, *et al.*,

      Defendants.

_____/

### <u>ORDER</u>

**THIS CAUSE** is before the Court on Defendant, Comcast Cable Communications, LLC's ("Defendant" or "Comcast") Motion to Compel Arbitration and Stay Litigation, ECF No. [23], (the "Arbitration Motion"). Defendant Elizabeth Renter ("Defendant Renter")[1] joined in Comcast's Arbitration Motion. *See* ECF No. [63]. Defendant iPacesetters, LLC ("iPacesetters") also joined in Comcast's Arbitration Motion, ECF No. [32], and further requested that in the event that the Court grants Comcast's Arbitration Motion but declines to include iPacesetters in its order to arbitrate that the Court stay the action pending the outcome of the arbitration between Comcast and Plaintiff Jenette Hicks ("Hicks" or "Plaintiff"). *Id.* On February 4, 2019, the Court held a bench trial (the "Bench Trial") solely to determine the issue of whether a valid agreement to arbitrate existed. *See* ECF No. [77], at 10. The Court has reviewed the Arbitration Motion, all supporting and opposing submissions, considered the arguments and evidence presented at the

---

[1] On December 10, 2018, Plaintiff filed a Notice of Suggestion of Death of Defendant Elizabeth Renter indicating that Defendant Renter died on November 17, 2018, and attaching an obituary evidencing the same. *See* ECF No. [73].

Bench Trial, the record and applicable law, and is otherwise fully advised.  For the reasons that follow, the Arbitration Motion is granted.

## I.   BACKGROUND

### A.   *Allegations in Plaintiff's Complaint*

This case arises out of an inappropriate incident during a routine sales call between Plaintiff and Defendant Renter, a Comcast sales representative.  ECF No. [19], at ¶ 32.  Defendant Renter called Plaintiff and left the following message on the Plaintiff's voicemail: "You got the right woman, n*gger! You talk a lot of sh*t over the f*cking phone, don't you? Good thing I got your address. N*gger!"  *Id.*  Plaintiff and her children could hear the message out loud while it was being recorded.  *Id.*  Plaintiff alleges that she and her children were horrified, shocked and humiliated by the message left by Defendant Renter.  *Id.* at ¶ 34.  Plaintiff claims she was afraid for herself and her family.  *Id.* at ¶ 35.  Plaintiff then reported the incident to the local authorities and to the Federal Trade Commission.  *Id.* at ¶¶ 36, 39.

On August 22, 2018, Plaintiff filed her First Amended Complaint ("Complaint") alleging several claims including: (1) violation of the Florida deceptive and unfair trade practices act; (2) intentional infliction of emotional distress; (3) defamation and libel *per se*; (4) invasion of privacy; (5) negligence; (6) negligent hiring, retention, and supervision; (6) *respondeat superior* liability; (7) injunctive relief; and (8) violation of equal rights under the law, 42 U.S.C. § 1981.  *See Id.* at ¶¶ 45-119.

In response to the Complaint, Comcast filed its Motion to Compel Arbitration.  ECF No. [23].  Comcast claims that the Comcast Agreement for Residential Services ("Subscriber Agreement") governs Hicks' business relationship with Comcast.  *Id*. at 2; *see also* ECF No. [24], at 20.  At the beginning of the Subscriber Agreement, it states "**THIS AGREEMENT**

2

Case No. 18-cv-61384-BLOOM/Valle

**CONTAINS A BINDING ARBITRATION PROVISION IN SECTION 13 THAT AFFECTS**

**YOUR RIGHTS UNDER THIS AGREEMENT WITH RESPECT TO ALL SERVICES**."

ECF No. [18-1], at 18 (emphasis in original).  In its Arbitration Motion, Comcast claims that the

Subscriber Agreement's arbitration provision requires Hicks to arbitrate all disputes regarding any

aspect of Hicks' relationship with Comcast.  ECF No. [23], at 2.  The Subscriber Agreement

contained a broad arbitration provision, which stated as follows:

> **13. BINDING ARBITRATION**:
> **a. Purpose.** Any Dispute involving you and Comcast shall be resolved through
> individual arbitration. In arbitration, there is no judge or jury and there is less
> discovery and appellate review than in court.
> **b. Definitions.** This Arbitration Provision shall be broadly interpreted. "Dispute"
> means any claim or controversy related to Comcast, including but not limited to
> any and all: (1) claims for relief and theories of liability, whether based in contract,
> tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that
> arose before this or any prior Agreement; (3) claims that arise after the expiration
> or termination of this Agreement, and (4) claims that are currently the subject of
> purported class action litigation in which you are not a member of a certified class.
> As used in this Arbitration Provision, "Comcast" means Comcast and any of its
> predecessors, successors, assigns, parents, subsidiaries, and affiliates, and each of
> their respective officers, directors, employees and agents, and "you" means you and
> any users or beneficiaries of the Service(s).
> **c. Exclusions.** Notwithstanding the foregoing, the following disputes will not be
> subject to arbitration: (i) disputes relating to the scope, validity, or enforceability of
> this arbitration provision; (ii) disputes that arise between Comcast and any state or
> local regulatory authority or agency that is empowered by federal, state, or local
> law to grant a franchise under 47 U.S.C. § 522(9); and (iii) disputes that can only
> be brought before the local franchise authority under the terms of the franchise. D.
> Right to opt out. If you do not wish to arbitrate disputes, you may decline to have
> your disputes with Comcast arbitrated by notifying Comcast in writing, within 30
> days of the date that you first receive this agreement or by visiting
> www.comcast.com/arbitrationoptout, or by mail to Comcast 1701 John F. Kennedy
> Blvd., Philadelphia, PA 19103-2838, Attn: legal department/arbitration. Your
> written notification to Comcast must include your name, address and Comcast
> account number as well as a clear statement that you do not wish to resolve disputes
> with Comcast through arbitration. Your decision to opt out of this arbitration
> provision will have no adverse effect on your relationship with Comcast or
> service(s) provided by Comcast. If you have previously opted out of arbitration
> with respect to the account governed by this agreement, you do not need to do so
> again. You must separately opt out for each account under which you receive
> services.

ECF No. [18-1], at 32-33.

In support of its Arbitration Motion, Comcast submitted a sworn affidavit (the "Patel Affidavit") from Nicole Patel ("Patel"), Director of Operations/Regulatory Compliance at Comcast Corporation. ECF No. [18-1]. The Patel Affidavit states that Hicks received and paid for Comcast services at her residential address located in Margate, Florida, from 2016 until April 2017. ECF No. [18-1], at ¶ 5. The Patel Affidavit further states that Hicks received Comcast services at other residential locations since 2008. *Id.* at ¶ 4. Patel claimed that the Plaintiff "received an update to the Subscriber Agreement in February 2009." *Id.* at ¶ 5. The Patel Affidavit states that it is Comcast's "routine and regular business practice for its technicians to provide the Subscriber Agreement with terms and conditions of service to customers when a technician performs a professional installation or transfer of services." *Id.* The Patel Affidavit also states that a Comcast technician was dispatched to Hicks' home on June 29, 2016, for purposes of transferring Comcast services. *Id.* at ¶ 4. The Patel Affidavit attaches two versions of the Comcast Subscriber Agreement, which it claims were the operative agreements during 2016 and 2017. *Id.* at ¶¶ 6, 8. Comcast periodically updates its Subscriber Agreement with the current version available on its website. *Id.* at ¶ 7. The Patel Affidavit states that the arbitration provision shall be governed by the Federal Arbitration Act ("FAA") and that the provision survives the termination of Comcast services. *Id.* at ¶¶ 15-16.

Hicks also submitted an affidavit in Plaintiff's Response in Opposition to the Arbitration Motion. ECF No. [36]. In her Affidavit, Hicks states that when Comcast technicians came to her house to install Comcast services, "at no time did any Comcast employee directly provide [Hicks] with the contract." ECF No. [36-1], at ¶ 9. Hicks further asserts "[a]t no time did any Comcast employee ever direct [Hicks] to read and accept any contract with Comcast and at no time did any

Comcast employee advise [Hicks] of any arbitration agreement that [she] would potentially have to enter into with Comcast." *Id.* Hicks states that she was presented with the Subscriber Agreement containing the arbitration provision for the first time on August 18, 2018, which was after the commencement of the instant action. *Id.* at ¶ 4. Hicks states that, upon receipt of the Subscriber Agreement on August 18, 2018, she timely opted out of the arbitration provision by sending Comcast an opt-out letter. *Id.* In her Response in Opposition to the Arbitration Motion, Hicks argues that no valid arbitration agreement exists between the parties, and that her claims are not bound by the arbitration agreement because she terminated her service agreement with Comcast prior to the incident that gives rise to this action. ECF No. [36], at 2.

On December 12, 2018, the Court issued an Omnibus Order noting that there was a genuine issue of fact regarding whether an agreement to arbitrate existed. ECF No. [77]. In light of the conflicting affidavits proffering contradictory testimony by the parties, the Omnibus Order scheduled a bench trial before this Court to determine the issue of whether an agreement to arbitrate exists between the parties. *See Hilton v. Fluent, LLC*, 297 F. Supp. 3d 1337, 1342 (S.D. Fla. 2018) (ordering a bench trial be held where there was a genuine issue of fact regarding the issue of whether an agreement to arbitrate existed.). The Bench Trial was held on February 4, 2019.

### B. *Evidence Presented at the Bench Trial*

At the Bench Trial, both parties stipulated to the admission into evidence of Patel's deposition, ECF No. [86-1],[2] and Comcast's Subscriber Agreement, Bench Trial, Def. Ex. 3. Patel testified that Comcast first installed services at Hicks' residence on May 4, 2008, transferred services to another location for Hicks on September 10, 2011, and again transferred services to another location on June 24, 2016. *See Patel Dep.*, ECF No. [86-1], at 44:20-45:22. Consistent

---

[2] Pursuant to Fed. R. Civ. P. 26(a)(3)(A)(ii), Comcast submitted Patel's deposition transcript as Patel's testimony for the Bench Trial. *See* ECF No. [86], at 2.

with Comcast's usual business practices, Patel claimed that on May 4, 2008 and September 10, 2011, Comcast would have left Hicks a paper copy of a welcome packet ("Welcome Kit"). *Id.* at 47:01-47:13.  Patel testified that Comcast's Welcome Kit is left with customers whenever services are installed or when transferring services from one address to another. *Id.* at 13:06-13:17; 17:14-17:22.  Patel also claimed that the documentation in the Welcome Kit contains the arbitration provision. *Id.* at 17:01-17:24.  Prior to 2016, Patel claims that Comcast changed its policy from providing the Welcome Kit in paper form to providing it electronically via e-mail. *Id.* at 13:18-13:21. Thus, it was Comcast's policy to submit an e-mail to customers containing the Welcome Kit and the terms of the agreement after the installation and/or transfer of Comcast services occurred. *Id.* at 32:09-32:15. Comcast presented an e-mail log (the "E-mail Log") reflecting that an e-mail was sent to the e-mail address provided by Hicks for her account on June 24, 2016.[3] Bench Trial, Def. Ex. 9.  Patel testified that the e-mail sent to Hicks on June 24, 2016, is consistent with Comcast's policy of following up with an e-mail containing the digital Welcome Kit, after Comcast installed and transferred the services to Hicks' new residence. *See* Patel Dep., ECF No. [86-1], at 47:14-48:09.  Further, Patel testified that on any occasion that a Comcast technician is dispatched to a customer's address, it is Comcast's usual business practice to distribute a copy of the Subscriber Agreement to the customer.  Patel Dep., ECF No. [86-1], at 13:12-13:14; 17:14-17:22; 20:03-20:10.

Hicks also testified at the Bench Trial. During her testimony, Hicks stated that if Comcast had given her a copy of the Subscriber Agreement, she would have saved it in her records.  At the Bench Trial, Hicks presented a picture of her filing cabinet that had an empty Comcast folder in it, which was located in her home.  Bench Trial, Pl. Ex. F.  Hicks testified that if she received the

---

[3] Due to the time that has passed, Comcast's records only reflect that an e-mail was sent, but it can no longer access the content of the e-mail itself. *See* Patel Dep., ECF No. [86-1], at 32:07-32:09.

Subscriber Agreement from Comcast, she would have placed it into the folder in the filing cabinet. In the picture, several folders, including an empty Comcast folder, were shown. *See Id.* During her testimony, Hicks also conceded that she received services from Comcast at three different locations, received emails confirming the disconnecting of services and return of equipment and further that a technician personally installed such services at these locations. Hicks claimed, however, that the Subscriber Agreement was simply never given to her on any of the three instances when services were installed. Hicks stated that any Comcast bills that were in the folder were given to Hicks' counsel. When asked about her understanding of the relationship between Plaintiff and Comcast, Hicks testified that she understood that the relationship consisted of Comcast supplying internet and cable services in exchange for her paying for those services.

## I.   LEGAL STANDARD

The Supreme Court has recognized an "emphatic federal policy in favor of arbitral dispute resolution." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631, (1985); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985) (noting that where parties have seen fit to adopt arbitration clauses in their agreements, there is a "strong federal policy in favor of enforcing [them]"). The validity of an arbitration agreement is governed by the Federal Arbitration Act ("FAA"). *Bhim v. Rent-A-Center, Inc.*, 655 F. Supp. 2d 1307, 1309 (S.D. Fla. 2009) (citing *Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1312-13 (11th Cir. 2002)). "The FAA establishes a 'federal policy favoring arbitration . . . requiring that [courts] rigorously enforce agreements to arbitrate.'" *Davis v. Prudential Sec., Inc.*, 59 F.3d 1186, 1192 (11th Cir. 1995) (quoting *Shearson/Am. Express Inc. v. McMahon*, 482 U.S. 220, 226 (1987)). The FAA provides that a court must either stay or dismiss a lawsuit and compel arbitration upon a showing that "(a) the plaintiff entered into a written arbitration agreement that is enforceable 'under ordinary state-

7

law' contract principles and (b) the claims before the court fall within the scope of that agreement."

*Lambert v. Austin Ind.*, 544 F.3d 1192, 1195 (11th Cir. 2008) (quoting 9 U.S.C. §§ 2-4).  Thus, the

party opposing arbitration has the burden, "not unlike that of a party seeking summary judgment,"

of showing why the court should not compel arbitration.  *Bhim*, 655 F. Supp. 2d at 1310 (citing

*Aronson v. Dean Witter Reynolds, Inc.*, 675 F. Supp. 1324, 1325 (S.D. Fla. 1987) (citations

omitted)).

"[W]hile doubts concerning the scope of an arbitration clause should be resolved in favor

of arbitration, the presumption does not apply to disputes concerning whether an agreement to

arbitrate has been made."  *Dasher v. RBC Bank (USA)*, 745 F.3d 1111, 1116 (11th Cir.

2014); *see Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 301 (2010) (directing courts

to "apply [] the presumption of arbitrability only" to "a validly formed and enforceable arbitration

agreement").  Therefore, "parties cannot be forced to submit to arbitration if they have not agreed

to do so."  *Magnolia Capital Advisors, Inc. v. Bear Stearns & Co.*, 272 F. App'x 782, 785 (11th

Cir. 2008).

"Under both federal and Florida law, there are three factors for the court to consider in

determining a party's right to arbitrate: (1) a written agreement exists between the parties

containing an arbitration clause; (2) an arbitrable issue exists; and (3) the right to arbitration has

not been waived."  *Sims v. Clarendon Nat. Ins. Co.*, 336 F. Supp. 2d 1311, 1326 (S.D. Fla. 2004)

(citing *Marine Envtl. Partners, Inc. v. Johnson*, 863 So. 2d 423, 426 (Fla. 4th DCA 2003) and

*Seifert v. U.S. Home Corp.*, 750 So. 2d 633 (Fla. 1999)).  The threshold question of whether an

arbitration agreement exists at all is "simply a matter of contract."  *First Options of Chicago, Inc.*

*v. Kaplan*, 514 U.S. 938, 943 (1995).  Absent such an agreement, "a court cannot compel the

parties to settle their dispute in an arbitral forum."  *Bazemore v. Jefferson Capital Sys.*, LLC, 827

F.3d 1325, 1329 (11th Cir. 2016) (citing *Klay v. All Defendants*, 389 F.3d 1191, 1200 (11th Cir. 2004)).  "[W]hen an arbitration agreement is not signed, we look to a party's words and conduct to determine whether the party assented to the agreement." *Santos v. Gen. Dynamics Aviation Servs. Corp.*, 984 So. 2d 658, 661 (Fla. 4th DCA 2008); *see also Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) (holding written arbitration agreement need not be signed to be enforceable where agreement provided for acceptance by continued employment). The party asserting a contract must prove its existence by a preponderance of the evidence. *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004).

"Federal policy favoring arbitration, however, is taken into consideration even in applying ordinary state law." *Caley*, 428 F.3d at 1368.  The party seeking to avoid arbitration "must unequivocally deny that an agreement to arbitrate was reached and must offer 'some evidence' to substantiate the denial." *Wheat, First Sec., Inc. v. Green*, 993 F.2d 814, 817 (11th Cir. 1993); *see Chastain v. The Robinson-Humphrey Company, Inc.*, 957 F.2d 851, 855 (11th Cir. 1992).  "The party challenging the arbitration provision must create a genuine issue of fact presenting 'enough evidence to make the denial colorable.'" *Sanders v. Comcast Cable Holdings, LLC*, No. 3:07-cv-918-J-33HTS, 2008 U.S. Dist. WL 150479, at *5 (S.D. Fla. January 14, 2008) (quoting *Chastain*, 957 F.2d at 855).  "A party does not place the making of the arbitration agreement in issue simply by stating no agreement exists." *Williams v. MetroPCS Wireless, Inc.*, No. 09-22890, 2010 WL 62605, at *9 (S.D. Fla. Jan. 5, 2010).

## II.   DISCUSSION

### A. *Validity and Enforceability of the Agreement to Arbitrate*

The Federal Arbitration Act ("FAA") provides that pre-dispute agreements to arbitrate "evidencing a transaction involving commerce" are "valid, irrevocable, and enforceable save upon

such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA reflects "a liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion,* 563 U.S. 333, 339 (2011). The FAA creates a "presumption of arbitrability" such that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Dasher*, 745 F.3d at 1115–16; *see Granite Rock Co.*, 561 U.S. at 301.

At the Bench Trial, Hicks argued that Comcast has not provided sufficient evidence demonstrating that she received the Subscriber Agreement, which contained the arbitration provision. However, the Court finds that persuasive evidence was presented that Hicks did, in fact, receive the Subscriber Agreement. The undisputed evidence established that it was Comcast's policy to send an e-mail to customers welcoming them with a Welcome Kit and the terms of the Subscriber Agreement, on the same day the installation and/or transfer of Comcast services occurs. Further, Comcast's E-mail Log reflects that Comcast sent Hicks an e-mail on the same day that Comcast installed and transferred services at Hicks' residence. Hicks, however, argued that the E-mail Log does not show or explain what was e-mailed to Hicks on June 24, 2016, which was the date of the last Comcast service installation and transfer at Hicks' residence. The Court is not persuaded by this argument. In reviewing the evidence, the Court finds that Comcast's E-mail Log is consistent with Comcast's policy of following up with an e-mail containing the Welcome Kit and Subscriber Agreement. Accordingly, the greater weight of the evidence supports that the Plaintiff did receive the Subscriber Agreement at that time.

Additionally, at the Bench Trial, Hicks testified that she received services from Comcast at three separate residences. Hicks, however, claims that each time a technician came to install such services they failed to give her a copy of the Subscriber Agreement. In weighing the evidence presented at the Bench Trial, the Court finds it is unlikely that such a continued failure occurred.

Accordingly, the Court finds that Hicks has not presented sufficient evidence to meet her burden to show that she did not receive the Arbitration Agreement, and the Court therefore finds that a valid agreement to arbitrate exists.

Besides her unequivocal denial, the only evidence Hicks presented supporting her position that she never received the Arbitration Agreement was the empty folder she testified she kept in her filing cabinet at her home.  The Court, in evaluating the testimony, does not find this evidence to be convincing. Hicks also argued that Comcast did not provide enough evidence to show that a Welcome Kit was sent to her.  The Court finds this argument to be unavailing.  Specifically, the E-mail Log shows that Comcast sent an e-mail to Hicks on the date that Comcast installed Hicks' services, which demonstrates that Hicks received the Welcome Kit containing the arbitration provision on June 24, 2016.  Pursuant to the Subscriber Agreement, Hicks had thirty days from receipt of the agreement to opt out of the Arbitration Agreement's terms.  Based on the date of the June 24, 2016, e-mail, at the very latest, Hicks had until July 24, 2016, to opt out of the arbitration provision and failed to do so. Thus, Hicks is bound by the Subscriber Agreement's terms and is also bound by the arbitration provision contained within the agreement.  The Court finds that Hicks has not presented sufficient convincing evidence to show that she did not receive the Arbitration Agreement.  Moreover, the greater weight of the evidence supports that Hicks received the Arbitration Agreement in the June 24, 2016, e-mail.

At the Bench Trial, Hicks also argued that Comcast did not provide evidence of a signed contract to show that she agreed to be bound by the Arbitration Agreement.  However, as long as the arbitration provision is in writing, the FAA does not require that an arbitration agreement be signed by either party.  *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1369 (11th Cir. 2005) ("[T]he overwhelming weight of authority supports the view that no signature is required to

meet the FAA's 'written' requirement."); *see Consol. Res. Healthcare Fund I, Ltd. v. Fenelus*, 853 So. 2d 500, 503 (Fla. 4th DCA 2003) ("A contract may be binding on a party despite the absence of a party's signature. . . . the object of a signature is to show mutuality or assent, but these facts may be shown in other ways, for example, by the acts or conduct of the parties."); *Sosa v. Shearform Mfg.*, 784 So. 2d 609, 610 (Fla. 5th DCA 2001) (finding that parties are bound to the provisions of an unsigned contract if they acted as though the provisions of the contract were in force). Here, Hicks' signature is not "needed to satisfy the FAA's written agreement requirement." *See Id.* In accordance with the FAA and case precedent, the Court finds that Comcast was not required to present a signed contract to prove Hicks agreed to be bound by the Arbitration Agreement's terms.

### B. *Defendant's Argument that Payment and Use of Services Manifests Assent to an Arbitration Agreement*

Under Florida law, a valid contract requires "offer, acceptance, consideration and sufficient specification of essential terms." *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004). "Mutual assent is not necessarily an independent 'element' unto itself; rather, we evaluate the existence of assent by analyzing the parties' agreement process in terms of offer and acceptance." *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014); *see Newman v. Schiff*, 778 F.2d 460, 465 (8th Cir. 1985). "A valid contract—premised on the parties' requisite willingness to contract— may be 'manifested through written or spoken words, or inferred in whole or in part from the parties' conduct.'" *Kolodziej*, 774 F.3d at 741 (11th Cir. 2014) (quoting *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th DCA 2011)).

At the Bench Trial, Comcast presented several cases, which it contends support the proposition that a party's use and payment of services constitutes assent to a contract terms, including one containing an arbitration agreement. The Court has reviewed the cases that Comcast

provided and finds none controlling. Moreover, a majority of the cited cases were not decided under Florida law. *Losapio v. Comcast Corp.*, No. 1:10-CV-3438-RWS, 2011 WL 1497652, at *3 (N.D. Ga. Apr. 19, 2011) (finding that under Georgia law valid arbitration agreements may be formed by the continued use or acceptance of Comcast services); *Honig v. Comcast of Ga. I, LLC*, 537 F. Supp. 2d 1277, 1283-1284 (N.D. Ga. Jan. 31, 2008) (finding that under Georgia law paying and receiving Comcast services constitutes assent for a binding contract with a valid arbitration provision). The only two Florida cases that Comcast cited did not determine that the payment and use of services manifested assent to an arbitration agreement. *See Smith v. Comcast Cable Commc'ns. Mgmt., LLC*, No. 15-62672-CIV, 2016 WL 4480975 *2 (S.D. Fla. Aug. 22, 2016); *Sanders v. Comcast Cable Holdings, LLC*, No. 3:07-cv-918-J-33HTS, 2008 WL 150479 *3 (M.D. Fla. Jan. 14, 2008).

In *Smith v. Comcast Cable Communications Management,* the District Court for the Southern District of Florida held that a valid agreement to arbitrate existed where the defendant mailed the plaintiff a brochure containing the arbitration provision and where the plaintiff acknowledged receipt of the brochure with an electronic notification form. *See Smith*, 2016 WL 4480975 at *2-3. Here, the facts are distinguishable as no evidence was presented that Comcast sent Hicks a brochure containing an arbitration provision and no evidence that Hicks acknowledged receipt of same.

Moreover, in *Sanders v. Comcast Cable Holdings, LLC*, the District Court for the Middle District of Florida found that the plaintiffs received the arbitration notices, where the notices were enclosed in the cable bills mailed to them. *Sanders*, 2008 WL 150479 at *6. The *Sanders* court further determined that the plaintiffs' use of services and payment of cable bills that contained the arbitration notices militated in favor of finding that the plaintiffs agreed to arbitration. *Id.* The

13

present case is distinguishable from *Sanders*, because there was no evidence presented that arbitration notices were enclosed in the bills sent to Hicks regarding her services.

Nonetheless, the Court need not decide that the payment and receipt of Comcast services constitutes assent to the Arbitration Agreement because the Court finds that the greater weight of the evidence presented at the Bench Trial supports that Hicks received the Subscriber Agreement.

### C. *Plaintiff's Other Arguments*

Alternatively, Hicks argues in her Response to the Arbitration Motion that the arbitration provision should not survive the termination of her business relationship with Comcast. ECF No. [36], at 10. The arbitration provision at issue, however, contains a survival clause. The survival clause states that "[t]his Arbitration Provision shall survive the termination of [Hicks'] Service(s) with Comcast." ECF No. [18-1], at 34. In addition, Courts have rejected similar arguments. *See Milfort v. Comcast Cable Commc'ns Mgmt. LLC*, 309 F. Supp. 3d 1268, 1272 (S.D. Fla. 2018) (finding that the arbitration provision in a subscriber agreement remained in effect following the termination of a business relationship between the parties); *see also, Day v. Persels & Assocs.*, No. 8:10-CV-2463-T-33TGW, 2011 WL 1770300, at *3 (M.D. Fla. May 9, 2011) (finding that the cancelation of services did not revoke the entire agreement where the agreement expressly stated that the "Arbitration Agreement . . . paragraph[ ] of this agreement continue to apply after this agreement ends"); *But cf.* , *Dist. No. 1 - Marine Eng'rs Beneficial Ass'n v. GFC Crane Consultants, Inc.*, 331 F.3d 1287, 1291 (11th Cir. 2003) (acknowledging that arbitration obligations end upon expiration of the agreement unless the parties have agreed otherwise). Here, given that the Court finds that Hicks received the Subscriber Agreement, and because the agreement contained a survival clause, the Court finds that the termination of Hicks' relationship with Comcast has no

effect on the arbitration provision's enforceability.  Thus, the Court finds that the arbitration provision survives the termination of the agreement.

Hicks next argues that her claims do not arise under the Arbitration Agreement and that "the contractual obligation to arbitrate is not limitless despite any broad arbitration clause bargained for."  ECF No. [36], at 12, 15.  Comcast, however, included that the arbitration provision covers: "(1) claims for relief and theories of liability, whether based in contract, tort, fraud, negligence, statute, regulation, ordinance, or otherwise; (2) claims that arose before this or any prior Agreement; (3) claims that arise after the expiration or termination of this Agreement  . . ." ECF No. [18-1], at 32-33.  In support of her argument, Plaintiff cites *Gamble v. New England Auto Fin., Inc.* for the proposition that although an arbitration agreement's language can be broad, it cannot be limitless.  ECF No. [36], at 13 (citing *See Gamble v. New England Auto Fin., Inc.*, No. 17-15343, 2018 WL 2446607, at *2 (11th Cir. May 31, 2018)).  In *Gamble*, however, the Eleventh Circuit Court of Appeals held that a class action including a Telephone Consumer Protection Act ("TCPA") claim did not fall within the scope of the parties' loan agreement.  *Id*. at *3.  Here, the Court is not persuaded by Hicks' argument, as the present case is distinguishable from *Gamble*, given that there is no class action, loan agreement, or a similar TCPA claim.  *See Id.*  Further the Eleventh Circuit has also held that tort and breach of contract claims, similar to the claims asserted in the instant action, are subject to a broad arbitration provision requiring arbitration of "any dispute" between the parties.  *See Gregory v. Electro-Mech. Corp.*, 83 F.3d 382, 386 (11th Cir. 1996) (holding that fraud, other tort, and breach of contract claims all fell within the scope of an arbitration provision requiring arbitration of "any dispute" between the parties.").  Accordingly, the Court finds that the claims asserted by Plaintiff are subject to the broad language of the Arbitration Agreement in the present action.  *See E.E.O.C. v. Waffle House, Inc.*, 534 U.S. 279,

289 (2002) ("[I]t is the language of the contract that defines the scope of disputes subject to arbitration.").

Hicks further argues that there is nothing in Comcast's Arbitration Agreement that was "clear and unmistakable" that would suggest that Plaintiff was surrendering her constitutional right to allege civil rights violations after she ended the business relationship with Comcast.  ECF No. [36], at 19.  In support of her argument, Hicks cites *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70 (1998), and *Metro. Edison Co. v. N.L.R.B.*, 460 U.S. 693 (1983), for the proposition that Comcast must establish that Plaintiff made a clear and unmistakable waiver of her statutory and constitutional rights to a trial by jury, ECF No [36], at 19.  In *Wright*, the United States Supreme Court "[held] that the collective-bargaining agreement in [the] case [did] not contain a clear and unmistakable waiver of the covered employees' rights to a judicial forum for federal claims of employment discrimination."  *Wright*, 525 U.S. at 82.  In *Metro*, the United States Supreme Court decided a National Labor Relations Act violation and determined that a union did not make a clear and unmistakable waiver of statutory protection in a labor agreement.  *Id.* at 707-10.  Given that the present case does not involve a labor union, or an employment discrimination claim and since this Court finds that Hicks entered into a valid Arbitration Agreement that covers Hicks' claims, this Court finds that Hicks' argument is not sufficient to eschew the strong federal policy in favor of enforcing the arbitration agreement.  *See Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 217 (1985).

Finally, Hicks argues that her constitutional claims against the Defendant are unsuitable for arbitration because public policy prevents "claims as egregious as those at issue from being forced into the darkness of private arbitration."  ECF No. [36], at 19.  Specifically, Hicks argues that "a party resisting the enforcement of an established arbitration agreement must demonstrate

that Congress specifically intended that the claim not be arbitrable" and that "nothing in the historical records suggests that Congress intended that victims of slavery and discrimination could be compelled to arbitrate their constitutional violation claims." *Id.* at 19-20.  In support of her argument, Plaintiff cites *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20 (1991).  In *Gilmer*, however, the United States Supreme Court "conclude[d] that [the plaintiff] has not met his burden of showing that Congress, in enacting the Age Discrimination in Employment Act ("ADEA"), intended to preclude arbitration of claims under that Act." *Id.* at 35.  Here, the arbitrable claims at issue are not employment discrimination claims.  In its Reply to Plaintiff's Response in Opposition to the Arbitration Motion, Defendant cites *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009), for the proposition that discrimination claims are arbitrable.  *See 14 Penn Plaza LLC v. Pyett*, 556 U.S. 247, 274 (2009).  In *Pyett*, the United States Supreme Court held that the plaintiff's ADEA claims were subject to binding arbitration.  *Id.*; *see also Brown v. ITT Consumer Fin. Corp.*, 211 F.3d 1217, 1224 (11th Cir. 2000) (affirming the motion to compel arbitration of plaintiff's statutory discrimination claims).  The Court finds that the claims asserted by Hicks' in the First Amended Complaint are suitable for arbitration.  Accordingly, the Court concludes as a matter of law that a valid agreement to arbitrate has been entered into by the parties and that the Plaintiff's claims should be sent to arbitration.

### D. iPacesetters' Motion to Compel Arbitration

In her Response in Opposition to Defendant iPacesetters' Joinder in Comcast's Arbitration Motion, Plaintiff concedes that iPacesetters is an agent of Comcast. *See* ECF No. [45], at 3. The Subscriber Agreement's arbitration provision contains the following language "[a]s used in this Arbitration Provision, 'Comcast' means Comcast and any of its predecessors, successors, assigns, parents, subsidiaries, and affiliates, and each of their respective officers, directors, employees and

Case No. 18-cv-61384-BLOOM/Valle

*agents*, and 'you' means you and any users or beneficiaries of the Service(s)." ECF No. [18-1], at 32-33 (emphasis added). Thus, given that the Court finds that a valid agreement to arbitrate has been entered into with Comcast, and in light of Plaintiff's concession that iPacesetters is an agent of Comcast, the Court finds that the claims between iPacesetters and Plaintiff must also be compelled to arbitration.

## III.   CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Comcast's Motion to Compel Arbitration, **ECF No. [23]**, is **GRANTED**.

2. Defendant iPacesetters' Motion to Compel Arbitration, **ECF No. [32]**, is **GRANTED**.

3. The parties shall submit all claims asserted in the Complaint to arbitration in accordance with the Subscriber Agreement.

4. This matter is **STAYED** pending arbitration of Plaintiff's claims and is therefore administratively **CLOSED**. The Clerk of Court is directed to **CLOSE** this matter for administrative purposes. After arbitration has concluded, either party may seek to reopen the case.

5. All pending motions are **DENIED AS MOOT**, and any pending deadlines are **TERMINATED**.

**DONE AND ORDERED** in Miami, Florida, this 27th day of March, 2019.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

18

Case No. 18-cv-61384-BLOOM/Valle

Copies to:

Counsel of Record